**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **TABITHA HAYDEN, as personal representative,** | ) | |
| **of BRIAN HAYDEN,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **15-CV-133-JHP** |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was presented to the Court during a non-jury trial which began on May 31, 2016 and concluded on June 2, 2016. The transcript of the proceedings was filed on June 15, 2016. Trial briefs were submitted by the parties on July 15, 2016. After consideration of all evidence and relevant caselaw, the Court makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

### CHOCTAW COUNTY SHERIFF DEPUTY BRIAN HAYDEN

1.    Brian Hayden ("Deputy Hayden") was hired as a Choctaw County Sheriff's Deputy on December 29, 2011. (Pretrial Order, Dkt. #71 at Fact Stipulation O)

2.    Deputy Hayden married Tabitha Thomas ("Plaintiff") on May 10, 2010. (Tr.Tra. p. 224, lns. 16-22) [1]

3.    Deputy Hayden and Plaintiff moved to Choctaw County in December 2011. (Tr.Tra. p. 226, lns. 10-20)

4.    Deputy Hayden was not familiar with the Choctaw County area at the time he moved there in December 2011. (Tr.Tra. p. 254, ln. 23 – p. 255, ln. 8)

---

[1]       The United States' citations to Tr.Tra. p.___, ln.___, refer to the page and line numbers of the Transcript of Non-Jury Trial Proceedings.

1

5.     On April 19, 2012, Deputy Hayden had not been employed long enough with the Choctaw County Sheriff's Department to be familiar with the Choctaw County area. (Tr.Tra. p. 329, ln. 24 – p. 330, ln. 2)

## CHOCTAW NATION TRIBAL OFFICER JOSIAH MOORE

6.     Josiah Moore ("Officer Moore") began working as a law enforcement officer in 2005 for the Hugo Police Department. (Tr.Tra. p. 245, ln. 22 – p. 246, ln. 1)

7.     Approximately six months later, Officer Moore began working as a law enforcement officer for the Choctaw County Sheriff's Department and became certified as a police officer by the Oklahoma Council on Law Enforcement Education and Training ("CLEET") in 2006. (Tr.Tra. p. 175, lns. 15-20; p. 245, ln. 22 – p. 246, ln. 6; p. 247, lns. 9-13)

8.     As part of Officer Moore's CLEET certification, he attended a nine week training course and received 26 hours of law enforcement driver training at the CLEET academy. (Joint Trial Exhibit No. 5; Tr.Tra. p. 248, ln. 12 – p. 250, ln. 5)

9.     Since receiving his CLEET certification in 2006, Officer Moore maintained this certification and remained in good standing with CLEET. (Tr.Tra. p. 252, lns. 5-16)

10.     Prior to 2010, Officer Moore also served as a law enforcement officer for the Pushmataha County Sheriff's Department and served a second stint as a police officer for the Hugo Police Department. (Tr.Tra. p. 246, ln. 16 – p. 247, ln. 1)

11.     In 2010, Officer Moore returned to work as a law enforcement officer for the Choctaw County Sheriff's Department. (Tr.Tra. p. 246, ln. 23 – p. 247, ln. 1)

12.     Officer Moore  was hired as a Choctaw Nation tribal police officer in August 2011. (Tr.Tra. p. 246, ln. 23 – p. 247, ln. 3; p. 250, lns. 7-21)

13.     Officer Moore was assigned to patrol Choctaw and the southern portion of Pushmataha Counties as part of his responsibilities as a police officer for the Choctaw Nation and was knowledgeable about this area from his previous work as a law enforcement officer. (Tr.Tra. p. 250, ln. 22 – p. 251, ln. 2)

14.     Officer Moore was trained and supervised by Field Training Officers at the law enforcement agencies for which he previously worked. (Tr.Tra. p. 251, ln. 16 – p. 252, ln. 4)

15.     Since beginning work as a law enforcement officer in 2005,  Officer Moore received on-the-job driver training and experience related to proper speed and following distances every day he operated a patrol car. (Tr.Tra. p. 301, ln. 14 – p. 302, ln. 8)

16.     As part of his duties as a Choctaw Nation police officer, Officer Moore assisted the Choctaw County Sheriff's Deputies on several occasions each month, when necessary. (Tr.Tra. p. 253, ln. 1 – p. 254, ln. 12)

17.     Based on his work as a law enforcement officer in the area since 2005, Officer Moore was friends with most other local law enforcement officers in the Choctaw County area. (Tr.Tra. p. 254, lns. 13-22)

18.     Officer Moore had a growing friendship with Deputy Hayden as of April 19, 2012, as Deputy Hayden had only recently moved to the area. (Tr.Tra. p. 254, ln. 23 – p. 255, ln. 8)

## DEPUTY JODY KING'S RESPONSE TO "SHOTS FIRED" CALL

19.     On April 19, 2012, radio and telephone communications between law enforcement officials in Choctaw County, Oklahoma were recorded in the Choctaw County communications center. (Tr.Tra. p. 77, lns. 12-21)

20.     The "names" of the audio recordings produced by the Choctaw County communications center and used as exhibits in this case are "time stamps" that indicated the time that the recordings began on a 24 hour clock (military time), according to the computer system that created the files. The times indicated are approximately one hour ahead of the then correct time. (Pretrial Order, Dkt. #71 at Fact Stipulation I; Tr.Tra. p. 115, lns. 1-7)

21.     Jody King was employed as a Choctaw County Sheriff's Deputy on April 19, 2012. (Tr.Tra. p. 76, ln. 16 – p. 77, ln. 1)

22.     At 7:29 p.m. on April 19, 2012, Deputy King was dispatched to a large altercation where a firearm had reportedly been discharged ("shots fired call"). (Tr.Tra. p. 88, ln. 1 – p. 89, ln. 3)

23.     Prior to arriving at the scene of the shots fired call, Deputy King spoke with Deputy Hayden over the telephone. Deputy King requested Deputy Hayden respond to the scene to help interview witnesses and bring additional witness statement forms due to the large number of people involved. (Tr.Tra. p. 93, ln. 16 – p. 94, ln. 11)

24.     Deputy King arrived on the scene of the shots fired call at 7:42 p.m. (Tr.Tra. p. 117, lns. 5-16; Joint Trial Exhibit No. 12)

25.     Prior to 7:42 p.m., Deputy King had no personal knowledge of the situation of the scene of the shots fired call. (Tr.Tra. p. 117, lns. 14-23)

26.     Upon arriving at the scene of the shots fired call, witnesses reported to Deputy King that two people had possibly been shot. (Plaintiff's Trial Exhibit No. 7 at p. 13; Tr.Tra. p. 108, lns. 15-21)

27.     Deputy King was also informed a vehicle had been shot. (Tr.Tra. p. 89, ln. 18 – p. 90, ln. 5)

28.     At the scene of the shots fired call, Deputy King encountered a large group of

people scattering in different directions. (Tr.Tra. p. 108, lns. 22-24)

29.     Among this large group of people, Deputy King encountered an individual he believed had been shot. (Tr.Tra. p. 108, ln. 22 – p. 109, ln. 2)

30.     The individual whom Deputy King believed to have been shot refused to talk to Deputy King, saying "Fuck you…I don't wanna talk to you." (Plaintiff's Trial Exhibit No. 7 at p. 11; Tr.Tra. p. 109, lns. 3-9)

31.     Individuals at the scene of the shots fired call made threats indicating they were going to return to the scene with firearms and retaliate. (Tr.Tra. p. 94, lns. 4 – 19; Tr.Tra. p. 109, lns. 10-13)

32.     Deputy King was uncomfortable being at the scene of the shots fired call alone because of these threats of retaliation with firearms. (Tr.Tra. p. 94, lns. 4-19)

33.     While at the scene, Deputy King called Undersheriff Terry Park to say that he needed additional assistance to keep the peace while he performed an investigation into the shots fired call. (Tr.Tra. p. 98, lns. 11-24)

34.     At approximately 7:56 p.m., Deputy King called Choctaw County Emergency Dispatcher Benny Irvin and described his personal observations of the scene. (Tr.Tra. p. 120, lns. 1-14)

35.     Irvin passed away prior to the trial in this action. (Pretrial Order, Dkt. #71 at Fact Stipulation N)

36.     During the 7:56 p.m. phone call, Deputy King told Irvin there were individuals chasing each other around the area, that he was trying to secure the scene by himself in the presence of a large group of people, and that a situation involving gunplay was still "brewing." (Tr.Tra. p. 120, ln. 15 – p. 121, ln. 11)

37.     Deputy King perceived the events at the scene to be a volatile situation. (Tr.Tra. p. 121, lns. 12-14)

38.     While at the scene, Deputy King interpreted the shots fired call as a possible life-threatening situation and feared for the safety of those involved, as he believed there were injured and possibly missing people in the woods. (Tr.Tra. p. 103, ln. 18 – p. 104, ln. 18)

39.     Deputy King needed help at the scene as fast as possible. (Tr.Tra. p. 121, lns. 22-25)

40.     Based on the audio recordings and knowing Deputy King for many years, Officer Moore believes Deputy King was stressed, scared and needed help at the time he made the 7:56 p.m. call to Irvin. (Tr.Tra. p. 309, ln. 7 – p. 310, ln. 24)

41.     At approximately 8:09 p.m., Deputy King reported to Irvin that the situation at the shots fired call would "blow up again" if he did not get help at the scene. (Joint Trial Exhibit No. 21)

42.     Deputy King does not recall speaking with Officer Moore on April 19, 2012. (Tr.Tra. p. 98, ln. 25 – p. 99, ln. 2; Tr.Tran. p. 123, lns. 4-7)

43.     Deputy Hayden was not present when Officer Moore was dispatched to the scene of the shots fired call.  (Tr.Tra. p. 122, lns. 18-25)

44.     Deputy King has no knowledge of anything told to Officer Moore about the situation at the scene of the shots fired call. (Tr.Tra. p. 123, lns. 1-3)

### OFFICER MOORE'S EMERGENCY RESPONSE TO THE "SHOTS FIRED" CALL

45.     On April 19, 2012,  Officer Moore came on duty at approximately 8:00 p.m. (Tr.Tra. p. 256, lns. 5-16)

46.     While on duty on  April 19, 2012, Officer Moore was driving a Ford  Crown Victoria. (Defendant's Trial Exhibit No. 7; Tr.Tra. p. 256, ln. 17 – p. 257, ln. 11)

47.     The Crown Victoria driven by Officer Moore on April 19, 2012 was equipped with blue and red flashing emergency LED lights mounted at the top of the windshield, on the dash up against the windshield and on the outside mirrors. (Tr.Tra. p. 257, ln. 17 – p. 258, ln. 11)

48.     The Crown Victoria driven by Officer Moore on April 19, 2012 was also equipped with headlights which would strobe on and off when the emergency lights were activated.  (Tr.Tra. p. 258, lns. 13-14).

49.     The Crown Victoria driven by Officer Moore on April 19, 2012 was also equipped with an emergency siren. (Tr.Tra. p. 258, lns. 15-16)

50.     At approximately the time Officer Moore came on duty, he sent a text message to Deputy Hayden about meeting to eat dinner. (Tr.Tra. p. 258, lns. 17-22)

51.     In response to the text message regarding dinner, Deputy Hayden called Officer Moore to say that he could not meet for dinner and advised he had to assist Deputy King on the scene of an incident. (Tr.Tra. p. 258, ln. 23 – p. 259, ln. 4)

52.     During this phone call, Deputy Hayden requested Officer Moore go to the Choctaw County Communications Center and make ten copies of witness statement forms for Deputy Hayden to pick up and take to the scene.  Deputy Hayden made this request so he did not have to  get out of his patrol truck on the way to assist Deputy King. (Tr.Tra. p. 259, ln. 18 – p. 260, ln. 2)

53.     The Choctaw County Communications Center is located in the same building as the Choctaw County Sheriff's Department and jail. (Tr.Tra. p. 261, lns. 3-10)

54.     Officer Moore  agreed to make the copies as requested by Deputy Hayden. (Tr.Tra. p. 260, lns. 15-17)

55.     During the phone call with Officer Moore, Deputy Hayden did not provide any specifics to Officer Moore regarding the incident to which Deputy Hayden was responding with Deputy King. (Tr.Tra. p. 259, lns. 5-7)

56.     Upon arriving at the Communications Center, Officer Moore requested a master witness statement form from dispatcher Benny Irvin ("Irvin") and then walked to the copy machine to make ten copies as requested by Deputy Hayden. (Tr.Tra. p. 260, ln. 15 – p. 20)

57.     At the time he made copies of the witness statement form, Officer Hayden had no specific knowledge of the incident to which Deputies King and Hayden were responding. (Tr.Tra. p. 261, ln. 21 – p. 262, ln. 5)

58.     After making the copies, Officer Moore met Deputy Hayden in the sally port of the jail and handed the witness statement forms through the passenger side window of Deputy Hayden's patrol vehicle without any substantive discussion. (Tr.Tra. p. 262, lns. 6-19)

59.     At the point he handed the witness statement forms to Deputy Hayden, Officer Moore had no intention of responding to the shots fired call. (Tr.Tra. p. 263, lns. 7-12)

60.     At the point he handed the witness statement forms to Deputy Hayden, the only information Officer Moore had about the shots fired call was that Deputy Hayden needed statement forms to give to Deputy King. (Tr.Tra. p. 263, lns. 7-17)

61.     After handing the witness statement forms to Deputy Hayden, Officer Moore walked back through the jail to the dispatch station where Irvin requested he respond to Deputy King's location to assist on the scene of the shots fired call. (Tr.Tra. p. 262, lns. 6-11; Joint Trial Exhibit 17)

62.     The audio recording capturing the request of Officer Moore to assist Deputy King was initiated at 7:57 p.m. (Joint Trial Exhibit 17)

63.     Before Officer Moore left the dispatch area, he looked at Irvin and asked if Deputy King was scared. (Tr.Tra. p. 263, lns. 18-25; p. 315, lns. 4-13)

64.     Officer Moore asked Irvin if Deputy King was scared because he knows from personal experience there is a difference in emergency levels when law enforcement officers are alone on the scene of an incident. (Tr.Tra. p. 264, lns. 1-6)

65.     In response to Officer Moore's question of whether Deputy King was scared, Irvin responded affirmatively. (Tr.Tra. p. 263, lns. 7-9; p. 315, ln. 4 – p. 316, ln. 4; Joint Trial Exhibit 17)

66.     Irvin also told Officer Moore that Deputy King had "people wandering around everywhere" at the scene of the shots fired call. (Tr.Tra. p. 264, lns. 10-13; Joint Trial Exhibit 17)

67.     To Officer Moore, this meant that a large group of people were present in a situation that could become dangerous for Deputy King. (Tr.Tra. p. 264, lns. 1018)

68.     Based on Irvin's statements that Deputy King was scared and there were people running around everywhere at the scene, Officer Moore believed the situation at Deputy King's location to be an emergency and Deputy King needed assistance as fast as possible. (Tr.Tra. p. 265, lns. 8-13)

69.     Officer Moore did not question Irvin's statement that Deputy King was scared and

needed help because Irvin had been an emergency dispatcher for many years and could appropriately interpret the situation. (Tr.Tra. p. 310, ln. 25 – p. 311, ln. 7)

70. After this exchange with Irvin, Officer Moore got into his patrol car, activated his emergency lights and sirens, and responded toward Deputy King's location. (Tr.Tra. p. 264, ln. 24 – p. 265, ln. 21)

## VEHICLE COLLISION

71. After leaving the Choctaw County Sheriff's Department, Officer Moore traveled westbound on Highway 70. (Tr.Tra. p. 265, lns. 14-21)

72. At 8:02 p.m., while heading toward the scene, Officer Moore contacted Deputy Hayden by radio to let Deputy Hayden know he was en route to the shots fired call and would be coming up behind Deputy Hayden. (Tr.Tra. p. 266, ln. 4 – p. 267, ln. 10; Joint Trial Exhibit No. 18).

73. Deputy Hayden responded to this radio communication at 8:02 p.m. by acknowledging Officer Moore's statement and stating that the "incident is going to be down on Unger Road." (Tr.Tra. p. 267, lns. 2-19)

74. Officer Moore understood this statement by Deputy Hayden to mean that Deputy Hayden would be traveling to Unger Road. (Tr.Tra. p. 267, lns. 16-20)

75. Officer Moore was aware of Deputy King's general location and was aware he had to travel to Unger Road and turn south, then travel two miles and turn back to the east to find Deputy King. (Tr.Tra. p. 264, ln. 24 – p. 265, ln. 7)

76. To reach Unger Road from Highway 70, Deputy Hayden and Officer Moore would have to travel approximately five to seven miles west of Soper, Oklahoma. (Tr.Tra. p. 267, lns. 20-24)

77. Officer Moore responded to help Deputy King with his emergency lights and sirens activated. (Tr.Tra. p. 268, lns. 2-7)

78. As Officer Moore passed Soper, Oklahoma, he caught a glimpse of Deputy Hayden's Chevrolet patrol truck ahead in the distance. (Tr.Tra. p. 268, lns. 8-17)

79. Deputy Hayden was driving a full-size, extended cab pickup equipped with emergency lights. (Tr.Tra. p. 268, lns. 18-24)

80. The emergency lights on Deputy Hayden's patrol truck were activated when Officer Moore first established visual contact with Deputy Hayden ahead in the distance. (Tr.Tra. p. 268, lns. 11-17; p. 269, lns. 3-13)

81. Officer Moore then lost visual contact with Deputy Hayden after recognizing him ahead in the distance. (Tr.Tra. p. 269, lns. 14-15).

82. Deputy Hayden's patrol truck would not travel as fast as Officer's Moore's Crown Victoria patrol vehicle. (Tr.Tra. p. 168, ln. 25 – p. 269, ln. 2)

83.     As Officer Moore continued to travel west on Highway 70, he passed through a right-hand curve in the road near the Boggy Creek Bridge but could not see Deputy Hayden's vehicle. (Tr.Tra. p. 269, ln. 24 – p. 272, ln. 24).

84.     As Officer Moore began to exit the right-hand curve traveling west on Highway 70, Officer Moore observed Deputy Hayden ahead in the distance pulling to the shoulder of the highway near its intersection with County Road 4080 and slowing to a stop. (Tr.Tra. p. 272, ln. 25 – p. 273, ln. 10; p. 276, lns. 6-9; p. 298, lns. 6-12; Defendant's Trial Exhibit No. 3)

85.     Officer Moore was aware County Road 4080 at its intersection with Highway 70 would not lead to the scene of the shots fired call. (Tr.Tra. p. 276, ln. 25 – p. 278, ln. 4)

86.     County Road 4080 is a dead-end road that only leads to a residence at its intersection with Highway 70. (Tr.Tra. p. 276, lns. 19-22)

87.     Officer Moore could see the ultimate site of the collision as he exited the right-hand curve in Highway 70. (Tr.Tra. p. 273, ln. 15 – p. 275, ln. 16; Defendant's Trial Exhibit No. 3)

88.     As Officer Moore exited the curve and approached Deputy Hayden's position, the emergency lights on his patrol vehicle were activated. (Tr.Tra. p. 278, lns. 4-6)

89.     As Officer Moore exited the curve and approached Deputy Hayden's position, the emergency siren on his patrol vehicle was activated. (Tr.Tra. p. 278, lns. 7-8)

90.     As Officer Moore exited the curve and saw Deputy Hayden move to the shoulder, Officer Moore believed Deputy Hayden was pulling over to let him pass. (Tr.Tra. p. 276, lns. 6-12; p. 298, lns. 6-12)

91.     In Officer Moore's experience as a law enforcement officer, he understood that slower moving emergency vehicles often yield to faster moving emergency vehicles which are approaching from behind.  (Tr.Tra. p. 298, lns 13-19)

92.     In Officer Moore's experience as a law enforcement officer, he understood there is no requirement that a faster moving emergency vehicle communicate an intent to pass a slower moving emergency vehicle when the slower vehicle moves to the right or shoulder of a road. (Tr.Tra. p. 298, ln. 13 – p. 299, ln. 11)

93.     Because Officer Moore knew the area and how to get to Deputy King's location, Officer Moore believed Deputy Hayden was going to follow him to the scene of the shots fired call. (Tr.Tra. p. 276, lns. 6-13).

94.     Officer Moore did not radio Deputy Hayden because he believed Deputy Hayden saw him approaching from the rear and was allowing Officer Moore to pass. (Tr.Tra. 300, lns. 69)

95.     Believing this, when Officer Moore saw Deputy Hayden pull to the shoulder of Highway 70, he moved to the center of the highway to go around Deputy Hayden. (Tr.Tra. p. 276, lns. 6-14; p. 277, lns. 8-6)

96.     To reach Deputy King's location, Officer Moore and Deputy Hayden only had to

travel one more mile west before turning off Highway 70 onto Unger Road. (Tr.Tra. p. 299, lns. 12-14; p. 333, lns. 12-18)

97.     If Deputy Hayden had continued his normal course of travel for one additional mile, there would have been no need for Officer Moore to pass Deputy Hayden on Highway 70. (Tr.Tra. p. 299, lns. 15-17)

98.     Just before Officer Moore made the pass of Deputy Hayden near Highway 70's intersection with County Road 4080, Deputy Hayden made a left turn from the highway's shoulder toward County Road 4080 into the path of Officer Moore. (Tr.Tra. 276, lns. 15-18; p. 277, lns. 19-23)

99.     Deputy Hayden turned toward a dead-end road that would not lead to the scene of the shots fired call. (Tr.Tra. p. 276, ln. 25 – p. 278, ln. 2; p. 330, lns. 3-14)

100.    Toward the location of Deputy Hayden's left-hand turn from the shoulder of Highway 70, County Road 4080 is marked by a dead-end sign. Tr.Tra. p. 330, ln. 15 – p. 332, ln. 14; Defendant's Trial Exhibit No. 4)

101.    From the position where Deputy Hayden began his left-hand turn from the shoulder of Highway 70, it would have been possible for Deputy Hayden to see the dead-end sign located at the intersection of County Road 4080 and Highway 70. (Tr.Tra. p. 332, ln. 15 – p. 333, ln. 2)

102.    As Deputy Hayden turned in front of him, Officer Moore slammed on his brakes. (Tr.Tra. p. 277, lns. 24-25)

103.    Officer Moore could not have avoided a collision with Deputy Hayden. (Tr.Tra. p. 278, lns. 2-3)

104.    Officer Moore did not contact Deputy King by cell phone during his response to the scene of the shots fired call because it is not safe to operate cell phones and drive at emergency speeds. (Tr.Tra. p. 299, ln. 18 – p. 300, ln. 5)


## OHP ACCIDENT INVESTIGATION


105.    Oklahoma Highway Patrol Trooper Darrell Wofford was assigned to investigate the April 19, 2012 collision between Deputy Hayden and Officer Moore. (Tr.Tra. p. 317, lns. 14-20; p. 319, ln. 14-17; p. 320, ln. 18 – p. 321, ln. 2)

106.    Trooper Wofford has worked as an Oklahoma Highway Patrol Trooper for 8 years. (Tr.Tra. p. 317, lns. 21-23)

107.    Prior to his employment as an Oklahoma Highway Patrol trooper, Trooper Wofford worked as a law enforcement officer since 2001. (Tr.Tra. p. 317, ln. 24 – p. 318, ln. 5)

108.     During his investigation of the collision, Trooper Wofford reviewed radio and phone call recordings from the Choctaw County Sheriff's Department Comm Center. (Tr.Tra. 328, lns. 3-7)

109.     While listening to the audio recordings, Trooper Wofford realized that Dispatcher Irvin provided a non-existent and incorrect 911 address to Deputy Hayden after Deputy Hayden requested Deputy King's location. (Tr.Tra. p. 329, lns. 3-23)

110.     Through his investigation, it is Trooper Wofford's opinion Deputy Hayden came to a stop on the shoulder of Highway 70 near the intersection with County Road 4080 and attempted to make a left-hand turn toward County Road 4080 in an effort to reach Deputy King's location. (Tr.Tra. p. 330, lns. 3-12)

111.     Deputy Hayden's left turn onto County Road 4080 from Highway 70 would not have led him to Deputy King's location; instead, Deputy Hayden should have traveled another mile west to Unger Road. (Tr.Tra. p. 333, lns. 7-11)

112.     It is the opinion of Trooper Wofford that the incorrect, non-existent address given to Deputy Hayden by Irvin led Deputy Hayden to believe he needed to turn on County Road 4080 to reach Deputy King's location. (Tr.Tra. p. 330, lns. 3-14)

113.     Based on Trooper Wofford's investigation, the incorrect address given to Deputy Hayden by Irvin was a contributing factor to the collision. (Tr.Tra. p. 329, ln. 3 – p. 330, ln. 14; p. 333, ln. 19 – p. 334, ln. 13; Joint Trial Exhibit 1 at pp. 4-5)

114.     In his official report, Trooper Wofford concluded that Deputy Hayden performed an improper turn from the shoulder of Highway 70. (Tr.Tra. p. 334, lns. 19-25)

115.     Deputy Hayden's improper turn from the shoulder of Highway 70 was a contributing factor to collision with Officer Moore. (Tr.Tra. p. 334, lns. 19-22)

116.     Trooper Wofford does not know what speed Officer Moore was traveling prior to the collision but found that Officer Moore's speed was a contributing factor to the collision because it was above the speed limit of sixty five miles per hour. (Tr.Tra. 335, lns. 9-20)

117.     After listening to the audio recordings surrounding the shots fired call and the dispatch of Officer Moore to Deputy King's location, Trooper Wofford believes the situation was "high priority." This required a response as fast as possible with emergency lights and sirens. (Tr.Tra. p. 336, lns. 1-15)

118.     Trooper Wofford does not believe Officer Moore's speed during his response to the shots fired call was out of the ordinary for a law enforcement officer responding to such a call for assistance. (Tr.Tra. p. 336, lns. 16-25; Joint Trial Exhibit No. 1 at p. 5)

119.     While investigating the collision, Trooper Wofford did not find any statements made by Officer Moore to be untrue. (Tr.Tra. p. 337, lns. 1-4)

120.     The physical evidence of the collision analyzed by Trooper Wofford supported Officer Moore's version of the events. (Tr.Tra. p. 337, lns. 5-19)

121.     According to Trooper Wofford, it was reasonable for Officer Moore to believe

Deputy Hayden pulled to the shoulder of Highway 70 to let Officer Moore pass. (Tr.Tra. p. 337, ln. 25 – p. 338, ln. 7)

122.    In Trooper Wofford's experience as a law enforcement officer, it is not always necessary for emergency personnel to communicate by radio before initiating a pass on the highway. (Tr.Tra. p. 338, lns. 8-19)

123.    Throughout Trooper Wofford's investigation of the April 19, 2012 collision, Trooper Wofford never discovered any evidence of reckless behavior on behalf of Officer Moore. (Tr.Tra. p. 351, lns. 12-15)

124.    Deputy Hayden was not wearing a seatbelt at the time of the collision. (Tr.Tra. p. 351, ln. 18 – p. 352, ln. 12; Joint Trial Exhibit No. 1 at p. 1)

### OFFICER MOORE'S EMPLOYMENT WITH CHOCTAW NATION

125.    At the time of the April 19, 2012 collision, Officer Moore was acting within the scope of his employment as a tribal police officer for the Choctaw Nation. (Pretrial Order, Dkt. #71 at Fact Stipulation G)

126.    Prior to being hired at the Choctaw Nation Police Department, Officer Moore submitted to a physical fitness test and a panel interview of Choctaw Nation supervisors, and a background investigation was performed by the Choctaw Nation. (Tr.Tra. p. 354, ln. 18 – p. 355, ln. 22)

127.    The State of Oklahoma requires Choctaw Nation police officers to be CLEET certified within six months of hiring and maintain CLEET certifications. (Tr.Tra. p. 355, p. 23 – p. 356, ln. 15)

128.    Upon hiring, the Choctaw Nation requires its police officer to complete a Field Training Officer Program. (p. 357, ln. 21 – p. 359, ln. 2)

129.    Choctaw Nation Field Training Officers supervise and observe the trainee to determine each new officer's capabilities and aptitude for police work. (Tr.Tra. p. 359, lns. 3-17)

130.    Upon being hired as a Choctaw Nation tribal police officer, Officer Moore was trained by Field Training Officer Lewis Green, who rode with and evaluated Officer Moore. (Tr.Tra. p. 250, ln. 22 – p. 251, ln. 15)

131.    Officer Moore completed the Choctaw Nation's Field Training Officer Program without issue. (Tr.Tra. p. 359, lns. 18-24)

132.    The State of Oklahoma and CLEET do not require additional driver training for police officer certification other than what is provided in the CLEET Academy. (Tr.Tra. p. 356, ln. 24 – p. 357, ln. 9)

133.    Officer Moore resigned as a Choctaw Nation Police Officer after approximately three years due to his emotional struggles stemming from the April 19, 2012 collision with Deputy Hayden. (Tr.Tra. p. 359, ln. 25 – p. 360, ln. 21)

134.    Choctaw Nation Executive Director of Public Safety, John Hobbs, attempted to convince Officer Moore to change his mind and not resign because Officer Moore had always been a good officer. (Tr.Tra. p. 353, lns. 15-20; p. 360, ln. 22 – p. 261, ln. 4)

135.    Officer Moore was a good and competent police officer, and came highly recommended by all officers in his area. (Tr.Tra. p. 361, lns. 9-13)

136.    John Hobbs never knew Officer Moore to be reckless in the handling of his police duties. (Tr.Tra. p. 361, lns. 14-16)

137.    Officer Moore would be considered for rehire as a Choctaw Nation Police Officer. (Tr.Tra. p. 361, lns. 5-8)

138.    It is the policy of the Choctaw Nation that its police officers may exceed the legal speed limit and disobey traffic regulations in an emergency situation. (Tr.Tra. p. 366, ln. 16 – p. 367, ln. 1; Plaintiff's Trial Exhibit No. 5)

139.    The Choctaw Nation's written policy allowing its police officer to exceed the legal speed limit and disobey traffic regulations in emergency situations coincides with the Oklahoma statutes. (Tr.Tra. p. 366, lns. 16-24)

140.    Choctaw Nation Executive Director for Public Safety John Hobbs never doubted that Officer Moore could drive safely in emergencies or exercise appropriate judgment in his response speeds because of his CLEET training and evaluations by field training officers. (Tr.Tra. p. 373, lns. 2-13)

## DEFENDANT'S EXPERT OPINIONS AND CONCLUSIONS

141.    Defendant's accident investigation expert, Robert Painter, began work as an Oklahoma Highway Patrol trooper in 1968. (Tr.Tra. p. 375, lns. 2-11)

142.    After ten years of working as a trooper, Mr. Painter became a training officer for the OHP, teaching accident reconstruction for the OHP, CLEET and other law-enforcement agencies throughout Oklahoma. (Tr.Tra. p. 375, lns. 2-20)

143.    Mr. Painter has completed approximately 1,000 hours of education in various aspects of accident investigation and reconstruction. (Tr.Tra. p. 375, ln. 21 – p. 376, ln. 8)

144.    Mr. Painter is certified by the Accreditation Council for Technical Accident Reconstruction. (Tr.Tra. p. 376, lns. 9-21)

145.    As part of his training responsibilities for the OHP, Mr. Painter assisted in the establishment of an Emergency Vehicle Training Course ("EVOC"), which developed motor vehicle training activities and exercises for troopers. (Tr.Tra. p. 377, ln. 20 – p. 379, ln. 3)

146.    After establishing the EVOC course, Mr. Painter then assisted in the development of a training and certification course for EVOC instructors from various law enforcement agencies across the country. (Tr.Tra. p. 379, lns. 4-14)

147.    Through his work with the EVOC courses, Mr. Painter has taught law

enforcement officers from around the country how to operate vehicles in emergency situations. (Tr.Tra. p. 379, lns. 15-23)

148.    Based on his education and experience, it is Mr. Painter's opinion that the shots fired call to which Officer Moore was responding was an emergency. (Tr. Tra. p. 381, ln. 13 – p. 383, ln. 7)

149.    Deputy King's testimony and the audio recordings containing Irvin's statements to Officer Moore indicate Deputy King and Irvin both believed the shots fired call was an emergency and assistance was needed as fast as possible. (Tr.Tra. p. 381, ln. 13 – p. 382, ln. 5)

150.    Based on his experience as a law enforcement officer and reconstructionist, it is Mr. Painter's opinion the shots fired call was an emergency because Deputy King was alone at the scene of a dangerous domestic incident and he was concerned for the safety of others on the scene. (Tr.Tra. p. 412, ln. 24 – p. 413, 22).

151.    The audio recordings and Officer Moore's testimony provide further evidence that an emergency existed because Irvin informed Officer Moore that Deputy King was scared on the scene of the shots fired call. (Tr.Tra. p. 382, ln. 20 – p. 383, ln. 7)

152.    When a dispatcher describes a law enforcement officer as scared to another officer, this statement should be taken as true because the dispatchers deal with the officers every day and can understand whether an officer is under duress simply based on voice inflection. (Tr.Tra. p. 383, lns. 8-18)

153.    Based on Mr. Painter's experience as a highway patrol trooper and accident reconstruction investigator, he agrees with OHP Trooper Darrell Wofford's conclusion that Officer Moore's speed during his response to the shots fired call was not unreasonable. (Tr.Tra. p. 384, lns. 7-19)

154.    Through Mr. Painter's accident investigation and reconstruction, he determined Officer Moore was traveling considerably less than 100 miles per hour prior to the collision with Deputy Hayden. (Tr.Tra. p. 384, lns. 7-19)

155.    Through Mr. Painter's accident investigation and reconstruction, he determined that Deputy Hayden was stopped or traveling at a low rate of speed on the shoulder of Highway 70 as Officer Moore approached Deputy Hayden's position. (Tr.Tra. p. 384, ln. 20 – p. 385, ln. 5)

156.    Based on Mr. Painter's measurements, there are approximately 2,000 feet of distance between the point where Officer Moore established visual contact with Deputy Hayden after exiting the curve on Highway 70 and Deputy Hayden's stationary location on the shoulder of the highway. (Tr.Tra. p. 384, ln. 20 – p. 385, ln. 9)

157.    At normal highway speed of sixty five miles per hour, it takes approximately sixteen seconds for a car to exit the curve on Highway 70 and travel to the point of impact between Deputy Hayden and Officer Moore. (Tr.Tra. p. 385, ln. 6 – p. 386, ln. 4)

158.    Through Mr. Painter's accident investigation and reconstruction, he determined Officer Moore moved to the center of Highway 70 as he attempted to pass Deputy Hayden. (Tr.Tra.

159.     Based on Mr. Painter's education and experience, it was proper for Officer Moore to move to the center of the highway before passing Deputy Hayden in order to  provide separation between the two vehicles and to protect against an unforeseen action of Deputy Hayden pulling back into the westbound lane of travel.  (Tr.Tra. p. 386, lns. 5-23)

160.     Officer Moore's actions of slowing down and moving to the left as he initiated the pass of Deputy Hayden constituted defensive driving.  (Tr.Tra. p. 408, lns. 5-8)

161.     Based on Mr. Painter's education and experience, it was reasonable for Officer Moore to assume Deputy Hayden pulled to the shoulder to allow Officer Moore to pass because Officer Moore was the faster unit. (Tr.Tra. p. 386, lns. 5-17)

162.     Through Mr. Painter's accident investigation and reconstruction, he determined Deputy Hayden made a left-hand turn from the shoulder of Highway 70 into the path of Officer Moore.  (Tr.Tra. p. 386, ln. 24 – p. 387, ln. 3)

163.     Based on Mr. Painter's analysis of the scene and the damage profiles to the vehicles, it is his opinion that Deputy Hayden's vehicle was oriented as if he was making a turnaround at the point of impact.  (Tr.Tra. p. 387, ln. 4 – p. 389, ln. 20)

164.     Based on Mr. Painter's analysis, it is his opinion that Deputy Hayden was attempting to turn south on County Road 4080 from Highway 70 but overshot the intersection before coming to a stop on the shoulder and initiating his left-hand turn.  (Tr.Tra. p. 389, ln. 21 – p. 390, ln. 17)

165.     Based on Mr. Painter's education and experience, Deputy Hayden gave up the right-of-way at the moment he pulled to the shoulder of Highway 70 and was required to yield to any vehicle that was close enough to constitute an immediate hazard.  (Tr.Tra. p. 390, ln. 18 – p. 391,  ln. 2; p. 401, lns. 15-24)

166.     Officer Moore's approaching vehicle constituted an immediate hazard to Deputy Hayden from his position on the shoulder of Highway 70. (Tr.Tra. p. 401, ln. 25 – p. 402, ln. 3)

167.     Officer Moore's approaching vehicle, with emergency lights flashing, would have been visible to Deputy Hayden for approximately 2,000 feet had he looked.  (Tr.Tra. p. 402, lns. 4-21)

168.     Nothing would have prevented Deputy Hayden from seeing Officer Moore's approaching vehicle had he looked.  (Tr.Tra. p. 402, lns. 22-25)

169.     Based on Mr. Painter's education and experience, Deputy Hayden should have perceived Officer Moore approaching with emergency lights and sirens activated from his rear. (Tr.Tra. p. 403, lns. 2-4)

170.     Based on his investigation and experience, Mr. Painter concludes Deputy Hayden failed to yield the right-of-way to Officer Moore and Deputy Hayden's left-hand turn did not give Officer Moore an opportunity to take any kind of evasive action other than to apply his brakes. (Tr.Tra. p. 390, ln. 18 – p. 391, ln. 6)

171.     Based on Mr. Painter's investigation and reconstruction of the collision, he determined Officer Moore was traveling at approximately seventy nine miles per hour at the point he applied his brakes. (Tr.Tra. p. 400, lns. 12-16)

172.     To determine Officer Moore's speed at the time he applied his brakes, Mr. Painter developed a modeling procedure using a methodology called "conservation of linear momentum," a principle of physics stating that the momentum of an event (in this case the collision) and the momentum after the event is the same. (Tr.Tra. p. 403, ln. 5 – p. 404, ln. 4)

173.     Based on Mr. Painter's education and experience, it is his opinion that Officer Moore's speed of seventy nine miles per hour is reasonable under the circumstances for an emergency response with emergency lights and sirens activated. (Tr.Tra. p. 404, lns. 5-13)

174.     After laying down 109 feet of skid marks, Officer Moore's vehicle collided with Deputy Hayden's vehicle at sixty three miles per hour. (Tr.Tra. p. 400, lns. 12-21)

175.     Mr. Painter determined the speed of impact using the conservation of linear momentum application and modeling procedure. (Tr. Tra. p. 404, ln. 22 – p. 405, ln. 4)

176.     Based on Mr. Painter's investigation, it is Mr. Painter's opinion that speed was not a factor in the collision between Officer Moore and Deputy Hayden. (Tr.Tra. p. 405, lns. 2324)

177.     The cause of the collision, based on Mr. Painter's investigation, was Deputy Hayden's failure to yield to a vehicle that was so close it constituted an immediate hazard. (Tr.Tra. p. 405, ln. 25 – p. 406, ln. 15; p. 415, ln. 24 – p. 416, ln. 1)

178.     Through his investigation and experience, Mr. Painter determined Officer Moore did not have enough time to discern that Deputy Hayden was turning in front of him and then take evasive action by steering to the right after moving to the center of the roadway to initiate his pass of Deputy Hayden. (Tr.Tra. p. 391, lns. 7-17)

179.     Based on Mr. Painter's accident investigation and reconstruction, Officer Moore did everything he could to avoid a collision with Deputy Hayden by slowing down and moving to the left as he initiated the pass of Deputy Hayden. (Tr.Tra. p. 408, lns. 1-4)

180.     While Officer Moore may have expected Deputy Hayden to reenter the westbound lane of travel on Highway 70, his left turn in front of Officer Moore was a totally unexpected event. (Tr.Tra. p. 408, ln. 15 – p. 410, ln. 14)

181.     Because Deputy Hayden's left-hand turn was a totally unexpected event, it is Mr. Painter's opinion that Officer Moore's discriminative perception time would have been reduced to a point where he could not have reacted to Deputy Hayden's left turn, other than to continue his movement to the left side of the road and apply his brakes. (Tr.Tra. p. 410, lns. 15-24)

182.     Based on the reaction time required, it would not be possible or logical for Officer Moore to steer toward Deputy Hayden's turning vehicle and avoid the collision by passing Deputy Hayden on the right. (Tr.Tra. p. 411, ln. 25 – p. 412, ln. 10)

183.     Any attempt by Officer Moore to steer his vehicle to the right and toward Deputy Hayden's oncoming vehicle would have created additional risk to Officer Moore, as Deputy Hayden

may have stopped his left-hand turn, thereby leading to a collision in the right-hand lane. (Tr.Tra. p. 412, lns. 11-17)

184. Any attempt by Officer Moore to steer his vehicle to the right and toward Deputy Hayden's oncoming vehicle would create such a dramatic turn that exceeded the dynamic handling situation for Officer Moore's vehicle and cause Officer Moore to lose control. (Tr.Tra. p. 412, lns. 11-23)

185. It is Mr. Painter's opinion that Officer Moore was under no duty to radio Deputy Hayden as Deputy Hayden pulled to the shoulder of Highway 70. This is because Officer Moore had previously radioed to tell Deputy Hayden of his approach, Officer Moore was approaching with emergency lights and sirens, both Deputy Hayden and Officer Moore were traveling to the same location and Officer Moore's reasonable belief that Deputy Hayden was letting him pass. (Tr.Tra. p. 406, ln. 16 – p. 407, ln. 13)

186. It is Mr. Painter's experience as a law enforcement officer and accident reconstructionist that a faster law enforcement vehicle is always given preference to lead an emergency response. (Tr.Tra. p. 407, lns. 14-22)

187. As a law enforcement officer, Deputy Hayden would have known that a faster law enforcement vehicle would be given preference to lead an emergency response. (Tr. Tra. p. 407, lns. 23-25)

188. With respect to the training Officer Moore received, it is Mr. Painter's opinion that the Choctaw Nation met the standard required for law enforcement agencies in the State of Oklahoma by ensuring that Officer Moore was CLEET certified and that he received supplemental training to meet the demands of the job as a tribal police officer. (Tr.Tra. p. 413, ln. 23 – p. 414, ln. 22)

189. The standards for law enforcement driver training are the requirements established by CLEET in the State of Oklahoma. (Tr.Tra. p. 415, lns. 3-14)

190. In the opinion of Mr. Painter neither the Choctaw Nation nor Officer Moore breached any standard with respect to the training of Officer Moore. (Tr.Tra. p. 415, lns. 18)

191. Plaintiff's counsel suggested Officer Moore should have been sent to a course at Oklahoma State University to receive additional driver training. In the opinion of Mr. Painter, the courses suggested by Plaintiff's counsel do not teach law enforcement officers to drive toward an area vacated by an oncoming object. (Tr.Tra. p. 416, ln. 20 – p. 419, ln. 6)

192. The courses suggested by Plaintiff's counsel at Oklahoma State University train officers to understand the dynamics involved when inputting steering in a dramatic fashion and bringing the vehicle back under control – not to teach officers to drive toward an area being vacated by an object they are trying to avoid. (Tr.Tra. p. 416, ln. 20 – p. 419, ln. 6)

193. Based on Mr. Painter's education and experience, there is no amount of additional training that Officer Moore could have received that would have prevented the April 19, 2012 collision with Deputy Hayden. (Tr.Tra. p. 440, lns. 3-10)

### PLAINTIFF'S ACCIDENT EXPERT OPINIONS

194.    Plaintiff's accident reconstruction and training expert, Jimmy Gerald Jackson, did not receive or review any policies or procedures from the Choctaw Nation regarding its hiring or training practices. (Tr.Tra. p. 174, ln. 6-10)

195.    Mr. Jackson did not receive or review Officer Moore's CLEET training records. (Tr.Tra. p. 176, lns. 1-3)

196.    Mr. Jackson does not dispute that the Choctaw Nation met all requirements of the State of Oklahoma with respect to Officer Moore's police officer training. (Tr.Tra. p. 175, lns. 9-14)

197.    Mr. Jackson does not dispute that Officer Moore was supervised by field training officers after he was hired as a police officer by the Choctaw Nation. (Tr.Tra. p. 176, lns. 17-21)

198.    Mr. Jackson's opinion that the shots fired call was not an emergency is based on his understanding that Deputy Hayden and Officer Moore were merely taking witness statement forms to Deputy King. (Tr. Tra. p. 177, ln. 25 – p. 178, ln. 5)

199.    Mr. Jackson agrees that an emergency existed if the dispatcher told Officer Moore that Deputy King had people running around everywhere at the scene after shots had been fired and that Deputy King was scared. (Tr.Tra. p. 184, ln. 16 – p. 185, ln. 9)

200.    Mr. Jackson mistakenly believed Deputy King arrived on the scene of the shots fired call at 7:55 – not the correct time of 7:42. (Tr. Tra. p. 178, ln. 10 – p. 179, ln. 24)

201.    Mr. Jackson does not dispute the speed calculations made by Defendant's expert, Robert Painter.  (Tr.Tra. p. 158, lns. 18-23)

202.    Mr. Jackson has no evidence to dispute that Deputy Hayden came to a stop or appeared to be stopped on the shoulder of the highway prior to the collision. (Tr.Tra. p. 187, ln. 19 – p. 188, ln. 3)

203.    Mr. Jackson agrees that it is atypical for an emergency vehicle being passed to pull to the shoulder. (Tr.Tra. p. 189, lns. 13-24)

204.    Mr. Jackson agrees there is more than 1600 feet of straight, flat and unobstructed roadway following the westbound curve on Highway 70 after the Muddy Boggy Creek Bridge to the collision scene. (Tr.Tra. p. 190, lns. 5-17)

205.    Mr. Jackson agrees Deputy Hayden had an unobstructed view of Officer Moore's approach from his rear with emergency lights flashing for more than 1600 feet of travel. (Tr.Tra. p. 191, lns. 18-25)

206.    Mr. Jackson does not know whether Officer Moore was exceeding the speed limit when he exited the westbound curve on Highway 70 heading toward Deputy Hayden's position. (Tr.Tra. p. 192, lns. 5-20)

207.    Mr. Jackson agrees that a fifty to sixty mile per hour collision is consistent with all the evidence he reviewed in this case. (Tr.Tra. p. 192, lns. 21-25)

208.    Mr. Jackson agrees Deputy Hayden bears some responsibility for the collision

with Officer Moore.  (Tr.Tra. p. 193, lns. 2-5)

209.    It is Mr. Jackson's opinion that Deputy Hayden should have made sure no traffic was coming prior to beginning his left turn from the shoulder of Highway 70.  (Tr.Tra. p. 193, ln. 20 – p. 194, ln. 2)

210.    Mr. Jackson agrees that the accident between Deputy Hayden and Officer Moore would not have occurred if Deputy Hayden had not made the left-hand turn from the shoulder of Highway 70 at a stopped or near stopped position. (Tr.Tra. p. 194, lns. 3-6)

## PLAINTIFF'S ECONOMIC EXPERT OPINIONS

211.    Plaintiff's economic expert, William Clark, lacks knowledge of the financial benefit being provided to Deputy Hayden's son with cerebral palsy for health insurance. (Tr.Tra. p. 202, ln. 17 – p. 205, ln. 13)

212.    Mr. Clark was not provided with specific costs of health insurance coverage for Deputy Hayden's children; rather, he relied on estimates of costs to form his opinion concerning financial damages related to health insurance coverage. (Tr.Tra. p. 218, lns. 4-20)

213.    To determine whether any children of Deputy Hayden received health insurance coverage from him prior to his death, Mr. Clark merely relied on an email from a paralegal at Plaintiff's counsel's firm – not any official record, testimony or evidence. (Tr.Tra. p. 218, ln. 21 – p. 219, ln. 2)

214.    In forming his opinion regarding the income losses resulting from Deputy Hayden's death, Mr. Clark relied on inaccurate income figures – using out of date income from 2011, instead of his wage rate at the time of his death in 2011. (Tr.Tra. p. 212, lns. 8-23; Tr.Tra. p. 219, lns. 7-15).

215.    Mr. Clark agrees that the better estimate of Deputy Hayden's future earning potential is to annualize Deputy Hayden's 2012 earnings as a Choctaw County Sheriff's Deputy. (Tr.Tra. p. 219, ln. 17 – p. 221, ln. 6)

216.    By annualizing Deputy Hayden's 2012 wages from the Choctaw County Sheriff's Department, this reduces the income loss calculation by fourteen percent, to $662,688.00. (Tr.Tra. p. 221, ln. 7 – p. 222, ln. 5)

## ALLEGED DAMAGES

217.    The only evidence offered by Plaintiff regarding the effect of Deputy Hayden's death to support damages for loss of consortium is that the death was a "tragedy" and she lost "someone that was very special" to her. (Tr.Tra. p. 242, ln. 24 – p. 243, ln. 5)

218.    At the time of his death, Deputy Hayden was paying $200.00 per month for each of his children, which was to continue until they were no longer full-time students. (Tr.Tra. p. 18, ln. 13 – p. 19, ln. 4)

219.    There was no written agreement or court order requiring Deputy Hayden to pay

child support for his children through the time they attended college. (Tr.Tra. p. 24, lns. 3-12)

220. There was no written agreement or court order requiring Deputy Hayden to pay child support for his son Andrew while Andrew was living. (Tr.Tra. p. 24, lns. 13-16)

221. There was no written agreement or court order requiring Deputy Hayden to maintain health insurance for any of his children. (Tr.Tra. p. 25, lns. 8-17)

222. Deputy Hayden's oldest daughter, Jessica Vance, only saw Deputy Hayden in person on four occasions since 1997. (Tr.Tra. p. 42, lns. 14-17)

223. It was not uncommon for Vance to go a week or two without speaking to Deputy Hayden. (Tr.Tra. p. 42, lns. 18-22)

224. Vance was not invited to Deputy Hayden's wedding to Plaintiff. (Tr.Tra. p. 46, lns. 2-12)

225. Vance has not sought professional counseling as a result of Deputy Hayden's death. (Tr.Tra. p. 46, lns. 15-18)

226. Deputy Hayden's youngest daughter, Holly Hayden, only saw Deputy Hayden in person on three occasions since 1997. (Tr.Tra. p. 57, lns. 17-20)

227. Deputy Hayden's youngest son, James Hayden, only saw Deputy Hayden in person on two occasions since 1997. (Tr.Tra. p. 68, lns. 5-10)

228. James Hayden only spoke with Deputy Hayden approximately once every couple of weeks. (Tr.Tra. p. 59, lns. 15-24; p. 68, lns. 16-18)

## II. CONCLUSIONS OF LAW

1. This is an action under the Federal Tort Claims Act and the United States is liable for its torts in the same manner and to the same extent as a private individual would be in like circumstances under the law of the State of Oklahoma.

2. The damages recoverable in actions for wrongful death are governed by Oklahoma state law, at 12 O.S. § 1053.

3. Police officers in the State of Oklahoma are entitled to certain privileges when responding to emergency calls and making use of emergency lights or sirens. 47 O.S. § 11-106.

4. Police officers in the State of Oklahoma are authorized to exceed the maximum speed limits when responding to emergency calls and making use of emergency lights or sirens. 47 O.S. § 11-106.

5. Police officers in the State of Oklahoma are authorized to disregard regulations governing direction of movement when responding to emergency calls and making use of emergency lights or sirens. 47 O.S. § 11-106.

6. When responding to an emergency call and making use of emergency lights or sirens,

liability against the operator of an emergency is reserved only for those who recklessly disregard the risks to the public. 47 O.S. § 11-106. *See also State ex rel. Oklahoma Dept. of Public Safety v. Gurich*, 238 P.3d 1, 7 (Okla. 2010).

7.      Public policy demands a standard higher than mere negligence for situations involving emergency vehicles. *State ex rel. Oklahoma Dept. of Public Safety v. Gurich*, 238 P.3d 1, 7 (Okla. 2010).

8.      The shots fired call to which Deputy Hayden and Officer Moore were responding was an emergency.

9.      Officer Moore was responding to the shots fired call with emergency lights and sirens activated; therefore, 47 O.S. § 11-106 applies and the United States can only be held liable for the death of Deputy Hayden if Officer Moore's actions were in reckless disregard for the rights of others.

10.      The actions of Moore in responding to the shots fired call were not in reckless disregard of the rights of others; therefore, the United States is not liable for the death of Deputy Hayden.

11.      If the shots fired call is not an emergency, Plaintiff must prove by a preponderance of the evidence that: (1) there was a duty owed by the Defendant to Plaintiff, (2) there was a failure to perform that duty, and (3) that injuries to the Plaintiff were proximately caused by the Defendant's failures.

12.      Even if the shots fired call is not an emergency, Plaintiff must still demonstrate that Deputy Hayden's negligence was less than the combined negligence of any person or entity causing such damage. 23 O.S. § 13.

13.      In this case, Plaintiff failed to establish a prima facie case of negligence.

14.      Deputy Hayden owed a duty to yield to Officer Moore prior to making the left-hand turn from the shoulder of Highway 70 into the path of Officer Moore.

15.      Deputy Hayden's left-hand turn from the shoulder of Highway 70 into the path of Officer Moore constituted a failure to yield to oncoming traffic.

16.      Deputy Hayden breached the duty owed to Officer Moore by failing to yield to Moore's oncoming vehicle.

17.      Deputy Hayden's left-hand turn from the shoulder of Highway 70 would not have been reasonably expected by Officer Moore.

18.      The collision resulting from Deputy Hayden's left-hand turn from the shoulder of Highway 70 into the path of Officer Moore was unavoidable.

19.      Deputy Hayden's breach of the duty owed to Officer Moore by making the left-hand turn from the shoulder is the proximate cause of the collision.

20.      Deputy Hayden's left-hand turn from the shoulder of Highway 70 into the path of

Officer Moore was more negligent than any act of Officer Moore.

21.    Plaintiff has not proved that the actions of Officer Moore were greater than fifty percent negligent than those of Deputy Hayden.

22.    In Oklahoma, the "proximate cause of any injury must be the efficient cause which sets in motion the chain of circumstances leading to the injury.  Where the negligence complained of only creates a condition which thereafter reacts with a subsequent, independent, unforeseeable, distinct agency and produces an injury, the original negligence is remote rather than the proximate cause thereof.  This is held to be true though injury would not have occurred except for the original act.  Thus, the proximate cause of an event must be that which in the natural and continuous sequence, unbroken by any independent cause, produces that event and without which that event would not have occurred." *Beesley v. United States*, 364, F.2d 194, 196 (10th Cir. 1966).

23.    Officer Moore's speed at the time he applied his brakes was seventy nine miles per hour and the collision with Deputy Hayden's vehicle occurred at sixty three miles per hour.

24.    The speed at which Officer Moore was traveling during his response to the shots fired call merely created a condition which thereafter reacted with the subsequent, independent, and unforeseeable act of Deputy Hayden's left-hand turn from the shoulder of Highway 70.

25.    There is no physical and reliable evidence to show Officer Moore was traveling more than seventy nine miles per hour as he exited the curve on Highway 70 and observed Deputy Hayden pulling to the shoulder before the collision.

26.    Officer Moore's speed at the time of the collision was not the proximate cause of the collision.

27.    Officer Moore's speed at any time during his emergency response to the shots fired call was not the proximate cause of the collision.

28.    Officer Moore was under no duty to radio Deputy Hayden to inform Deputy Hayden of the intent to pass when he first observed Deputy Hayden slowing and pulling to the shoulder of the highway.

29.    Once he entered the shoulder of the highway, Deputy Hayden yielded the right--of-way to any oncoming vehicle and was under a duty to ensure no oncoming vehicles presented a danger when he initiated the left-hand turn from the shoulder.

30.    Officer Moore reasonably believed Deputy Hayden pulled to the shoulder of the highway to let him pass and resulted in Deputy King's location on the scene of the shots fired call.

31.    Had Deputy Hayden continued traveling west on Highway 70 for one mile to Unger Road, it would not have been necessary for Officer Moore to initiate a pass of Deputy Hayden on the highway.

32.    Officer Moore's need and opportunity to pass Deputy Hayden only arose at the moment Officer Moore exited the curve on Highway 70 and observed Deputy Hayden slowing and pulling to the shoulder.

33.     Officer Moore had insufficient time to radio Deputy Hayden in the seconds before he initiated a pass of Deputy Hayden while he was on the shoulder of the highway.

34.     Any failure of Officer Moore to radio Deputy Hayden prior to initiating a pass of Deputy Hayden was not the proximate cause of the collision.

35.     The Choctaw Nation met all standards required of the State of Oklahoma with respect to the police and driver training of Officer Moore.

36.     The Choctaw Nation was under no duty to provide additional driver training to Officer Moore.

37.     Officer Moore was a seasoned law enforcement officer at the time of the collision, having worked as a law enforcement officer in various capacities since 2005 and maintaining CLEET certification since 2006. Since 2005, Officer Moore received formal CLEET and on the-job experience in emergency law enforcement driving.

38.     As Deputy Hayden's unexpected turn in front of Officer Moore left insufficient time for Officer Moore to react and avoid the collision, no amount of additional driver training of Officer Moore would have prevented the collision.

39.     Any deficiency in the driver training of Officer Moore was not the proximate cause of the collision.

40.     In Oklahoma, once an employer has admitted vicarious liability for it employee's actions, no further theory of negligence associated with a particular incident may be maintained against the employer. *See Hodge v. Stan Koch  & Sons Trucking*, 2015 WL 247930, *2 (E.D.Okla. January 20, 2015); *See also Landreville v. Joe Brown Co., Inc.*, 2009 WL 1437801, *3 (E.D.Okla. May 21, 2009); *Huntley v. City of Owasso*, 497 Fed.Appx. 826, 834, (10th Cir. 2012).

41.     As the United States stipulated that Officer Moore was acting within the scope of his employment as a tribal police officer for the Choctaw Nation pursuant to a self-governance compact between the United States of America and the Choctaw Nation of Oklahoma, Plaintiff cannot maintain any additional cause of action against the Choctaw Nation for an alleged failure to train Officer Moore.

42.     The United States is not liable to Plaintiff for damages in this matter.


IT IS SO ORDERED this 13th day of October, 2016.

James H. Payne
United States District Judge
Eastern District of Oklahoma